2004 UT App 44

Barry **KELLY**, individually and in the right of Wapiti Heights, L.L.C., a Utah limited liability company, Plaintiff and Appellant,

v.

**HARD MONEY FUNDING, INC.**, a Utah corporation; each assignee of a beneficial interest of a certain trust deed; Gary A. Weston, as trustee under a certain trust deed; M.V.I.; JJ Associates; and V.C.I., Defendants and Appellees.

No. 20020854–CA.

Court of Appeals of Utah.

March 4, 2004.

---

Blake S. Atkin and Lonn Litchfield, Atkin & Hawkins, Salt Lake City, for Appellant.

Angela Oakes and Gary A. Weston, Nielsen & Senior PC, Salt Lake City, for Appellees.

Before Judges BENCH, DAVIS, and JACKSON.

## OPINION

JACKSON, Judge:

¶ 1 Barry Kelly (Kelly) appeals the orders of the trial court denying his motion to amend his complaint and granting summary judgment to Hard Money Funding, Inc. (Hard Money). We affirm in part and reverse and remand in part.

## BACKGROUND

¶ 2 Wapiti Heights, L.L.C. (Wapiti) was a Utah limited liability company with Barry Kelly (Kelly), Richard McDonald (McDonald), and Inger Winsor (Winsor) as its members. Wapiti owned nineteen parcels of real property in southwest Salt Lake County, which it intended to develop. In April 1997, Wapiti obtained a loan for $450,000. To secure payment of the loan, Wapiti executed a deed of trust against twelve of the parcels.

¶ 3 In June 1997, McDonald and Winsor formed PCO Holding Company, Inc., a Utah corporation. McDonald and Winsor were also owners of PCO, Inc., a separate company that managed the Green Street Social Club in Salt Lake City.

¶ 4 On April 6, 1999, the trustee overseeing Wapiti's $450,000 loan commenced foreclosure on the twelve properties by recording a notice of default. The trustee then scheduled a trustee's foreclosure sale for August 4, 1999. In an effort to head off foreclosure on the twelve parcels of property, Winsor approached Hard Money and sought a loan for Wapiti. After investigating Wapiti's organizational structure and finances, which included a review of a copy of Wapiti's Amended Operating Agreement, Hard Money refused to loan the money to Wapiti. In the course of these negotiations, however, Winsor also provided Hard Money with organizational and financial documents relating to the finances of PCO Holding Company, Inc., PCO, Inc., and the Green Street Social Club. After reviewing those documents, Hard Money agreed to loan money to PCO Holding Company, Inc. In order to provide collateral for the loan, McDonald and Winsor, acting as members of Wapiti, executed a warranty deed (the Warranty Deed) dated July 27, 1999. This deed conveyed from Wapiti to "PCO Holdings, Inc." the seven parcels of Wapiti-owned land that had not been used as security for the $450,000 loan. McDonald and Winsor then agreed to pledge the seven parcels to Hard Money as collateral for the loan.

¶ 5 Thus, after Hard Money had loaned $643,000 to "PCO Holdings, Inc.," McDonald and Winsor used the $643,000 loan from Hard Money, secured by the seven recently

transferred parcels of land, to purchase the twelve parcels of property that were the subject of the foreclosure sale (the Wapiti Trust Deed). At the sale, the purchaser of the property was identified as "PCO Holdings, Inc." As further security for the loan, McDonald and Winsor then provided Hard Money with a trust deed lien against the twelve parcels of property that had just been purchased (the Hard Money Trust Deed). Accordingly, after the various transactions had been completed, McDonald and Winsor owned legal title to all nineteen of Wapiti's former properties, and all nineteen of these properties were in turn security for McDonald and Winsor's debt to Hard Money.[1]

¶ 6 On September 12, 2001, Kelly commenced suit against Hard Money.[2] In his complaint, Kelly, acting both individually and on behalf of Wapiti, sought relief on three grounds. First, Kelly petitioned the court to quiet title in the nineteen properties. In this cause of action, Kelly noted that, while PCO Holding Company, Inc. and PCO, Inc. are both legally existing entities, there is no legally existing entity known as "PCO Holdings, Inc." Accordingly, insofar as the Warranty Deed (conveying the seven parcels of property from Wapiti), the Wapiti Trust Deed (in which the twelve parcels of property were bought from Wapiti at the August foreclosure sale), and the Hard Money Trust Deed (securing the nineteen parcels of property to the $643,000 loan) all referred to "PCO Holdings, Inc.," Kelly asked the court to declare those various transactions void on the grounds that they involved a nonexistent entity. Kelly also alleged that a quiet title order was appropriate due to McDonald and Winsor's breach of fiduciary duties that occurred when they acted to transfer Wapiti's properties to a separately-owned company. Finally, Kelly alleged that a quiet title order was appropriate insofar as "Defendant Hard Money enabled McDonald and Winsor to defraud Kelly."

¶ 7 Second, Kelly sought declaratory judgment, alleging that Hard Money's interests in the properties should be declared subordinate to Kelly's separately litigated claims against McDonald and Winsor. Third, Kelly sought injunctive relief in order to enjoin the foreclosure sale that was to occur as a result of McDonald and Winsor's own default on their loan from Hard Money.

¶ 8 On January 28, 2002, in response to Kelly's complaint, Hard Money filed a motion for summary judgment. Hard Money asserted that Kelly's complaint was not well-grounded, insofar as Kelly had failed to allege any damage that directly arose from Hard Money's actions. Hard Money further alleged that Kelly had no standing to file a quiet title action to the subject land, and that, in spite of Kelly's claims to the contrary, Hard Money owed no duty to Kelly or Wapiti.

¶ 9 On February 26, 2002, Kelly filed a memorandum in opposition to Hard Money's motion for summary judgment. In his memorandum in opposition, Kelly alleged that Hard Money had intentionally interfered with Kelly's contractual relations with McDonald and Winsor and had participated in their fraud against Kelly and Wapiti. Hard Money responded to this memorandum in opposition on March 4, 2002, by filing a reply memorandum that stated it would be improper to raise these new claims of law in a memorandum in opposition to a motion for summary judgment.

¶ 10 The trial court scheduled oral argument on the motion for summary judgment for April 8, 2002. On April 2, 2002, Kelly filed a motion to amend his complaint. In the proposed amended complaint, Kelly sought to add two new causes of action. First, Kelly sought to add a claim for inter-

---

1. Though unrelated to the present suit, it is worth noting that McDonald and Winsor have since defaulted on their loan from Hard Money, and foreclosure on the nineteen properties has been initiated.

2. Kelly also named various other parties as defendants in this suit. These parties are assignees of various beneficial interests in the properties. However, Kelly did not serve summons on these parties, and they are accordingly not before this court. Significantly, the September 2001 complaint did *not* list McDonald, Winsor, or any of the PCO related companies as defendants in the suit. The parties have indicated in their briefing, however, that Kelly has filed a separate suit against McDonald and Winsor for their roles in these various transactions.

ference with contractual relations. Second, Kelly sought to add a claim against Hard Money for breach of fiduciary duty.

¶ 11 On April 5, 2002, the trial judge assigned to the case, Judge J. Dennis Frederick, recused himself from the case. The case was reassigned to Judge William B. Bohling and oral arguments were postponed. On July 1, 2002, Judge Bohling heard oral argument on the motion for summary judgment and on the motion to amend the complaint.

¶ 12 On September 9, 2002, Judge Bohling entered an order granting Hard Money's motion for summary judgment and denying Kelly's motion to amend his complaint. Kelly appeals.

## ISSUES AND STANDARDS OF REVIEW

¶ 13 Kelly first argues that the trial court erred in granting summary judgment to Hard Money on Kelly's quiet title action, his request for a declaratory judgment, and his request for injunctive relief. In reviewing a trial court's "grant of summary judgment, we view the facts and all inferences reasonably drawn from those facts in a light most favorable to the nonmoving party." *Hodges v. Howell*, 2000 UT App 171, ¶ 2, 4 P.3d 803. However, "[b]ecause summary judgment by definition does not resolve factual issues, a challenge for summary judgment presents for review only questions of law. We review those conclusions for correctness, according no particular deference to the trial court." *Dikeou v. Osborn*, 881 P.2d 943, 945 (Utah Ct.App.1994) (internal quotations and citation omitted).

¶ 14 Kelly next argues that the trial court erred in denying his motion to amend his complaint. We overturn a trial court's denial of a motion to amend a complaint only when we find an abuse of discretion. *See Fish-*

*baugh v. Utah Power & Light,* 969 P.2d 403, 405 (Utah 1998).

## ANALYSIS

### I. Hard Money's Motions for Summary Judgment

¶ 15 We first consider Kelly's challenge to the trial court's grant of summary judgment. In its order granting summary judgment, the trial court treated the legal questions surrounding the disposition of the twelve parcels of property obtained by McDonald and Winsor at the Wapiti foreclosure sale as being analytically distinct from the legal questions surrounding the seven parcels of Wapiti property allegedly conveyed by McDonald and Winsor to "PCO Holdings, Inc."

¶ 16 With respect to the twelve parcels of property, the trial court ruled that Kelly lacked standing to pursue a quiet title action. According to the trial court, it was "undisputed that Hard Money ... had no involvement with either Wapiti or McDonald or Winsor prior to defaulting on its loan." Thus, "[b]ecause the undisputed facts demonstrate that Wapiti lost the twelve parcels through its default and the subsequent foreclosure, [Kelly] lacks standing to maintain this action for quiet title and for declaratory relief with respect to these twelve parcels."

¶ 17 With respect to the seven parcels of property, the trial court rejected Kelly's argument that the conveyance was invalid due to its incorrect reference to "PCO Holdings, Inc." as the assignee .[3] The trial court reasoned that though the deed contained an ostensibly erroneous reference to the designation of the actual assignee, the intention of the parties to convey the properties to PCO Holding Company, Inc. was reasonably ascertainable by the surrounding facts.[4] We address each ruling in turn.

3. As discussed above, though PCO Holding Company, Inc. and PCO, Inc. were validly registered corporations, it is undisputed by the parties that there was no existing corporation registered as "PCO Holdings, Inc."

4. The trial court also rejected Kelly's argument that Hard Money's purported involvement in McDonald and Winsor's scheme to "defraud" Wapiti and Kelly should act as grounds to subordinate Hard Money's interest in the properties to Kelly's

own claims against McDonald and Winsor. In his brief to this court, Kelly alluded to this argument in his various discussions of the alleged involvement of Hard Money in the various machinations of McDonald and Winsor. However, Kelly has not specifically argued the subordination issue in his appellate brief, and he has not provided us with any specific legal authority indicating that the trial court was incorrect on this point. Accordingly, we decline to address this

**A. Kelly's Standing to Maintain a Quiet Title Action with Respect to the Twelve Parcels of Property**

¶ 18 Kelly first argues that the trial court erred in concluding that he lacked standing to maintain a quiet title action regarding the twelve parcels of property. We disagree.

¶ 19 " 'To succeed in an action to quiet title to real estate, a plaintiff must prevail on the strength of his own claim to title and not on the weakness of a defendant's title or even its total lack of title.' " *Collard v. Nagle Const., Inc.,* 2002 UT App 306, ¶ 18, 57 P.3d 603 (quoting *Church v. Meadow Springs Ranch Corp.,* 659 P.2d 1045, 1048–49 (Utah 1983)). In *Andrus v. Bagley,* the Utah Supreme Court held that a party "had no standing to bring a quiet title action" due to the fact that the party "had no interest at the time [the] action was filed." 775 P.2d 934, 935 (Utah 1989). The *Andrus* court reasoned that "[t]he purpose of a quiet title action is to perfect an interest in property that exists at the time suit is filed. Because Andrus had no interest, he had no standing to bring the action." *Id.*

¶ 20 Here, it is undisputed that Wapiti defaulted on the $450,000 loan and that the foreclosure sale was a valid exercise of the trustee's power to foreclose on the twelve parcels of property that had been secured to the loan. Kelly has offered no evidence of any kind that the sale was improper, that alternative sources of funding could have been obtained, or that Hard Money had any connection to the circumstances giving rise to Wapiti's default. Thus, though Kelly has offered arguments addressing the possible improprieties surrounding the purchase of those twelve parcels, he has offered no evidence indicating that either he or Wapiti had any legitimate claim to retain those properties after the foreclosure. Given that he filed the quiet title action after the sale, we accordingly cannot say that the trial court erred in ruling that Kelly and Wapiti lacked standing to maintain a quiet title action with respect to the twelve parcels of property.

**B. The Validity of the Deed Transferring the Seven Parcels to a Non–Existent "PCO Holdings, Inc."**

¶ 21 Kelly next argues that the trial court erred in concluding that the Warranty Deed's incorrect reference to "PCO Holdings, Inc." as the assignee did not invalidate the transfer of the property from Wapiti to PCO Holding Company, Inc. We disagree.

> In determining whether a document purports to convey an interest in land, the court must "focus[ ] on the document to see whether it identified the grantor, the grantee, and the interest granted or a description of the boundaries in a manner sufficient to construe the instrument as a conveyance of an interest in land."

*Russell v. Thomas,* 2000 UT App 82, ¶ 13, 999 P.2d 1244 (alteration in original) (quoting *Rocky Mountain Energy v. Utah State Tax Comm'n,* 852 P.2d 284, 286 (Utah 1993)).

¶ 22 Kelly has not disputed that the Warranty Deed described the grantor, the interest granted, and the description of the boundaries "in a manner sufficient to construe the instrument as a conveyance of an interest in land." *Id.* Kelly argues only that the Warranty Deed's description of the grantee was legally insufficient.

> It is the general rule that, where there is a misnomer of a corporation in a grant, obligation, written contract, notice, or the like, if there is enough expressed to show that there is such an artificial being, and to distinguish it from all others, the corporate body is well named, even though there is a variation of words and syllables.

18A Am.Jur.2d *Corporations* § 286 (1985). Thus, " '[t]he misnomer of a corporation generally will not be treated by the courts as material, if the identity of the corporation is reasonably clear or can be ascertained by sufficient evidence.' " *Sunstone at Colo. Springs Homeowners Assoc., Inc. v. White,* 56 P.3d 127, 129 (Colo.Ct.App.2002) (quoting 6 William M. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 2444, at 156–58 (rev.vol.1996)). Accordingly, Utah

---

argument. *See Smith v. Fairfax Realty, Inc.,* 2003 UT 41, ¶ 30 n. 12, 82 P.3d 1064 ("This court is not obligated to address issues that are not adequately briefed.").

courts endeavor to " 'carry out the grantor's intention whenever this is possible.' " *Julian v. Petersen*, 966 P.2d 878, 881 (Utah Ct.App. 1998) (quoting *Wiggill v. Cheney*, 597 P.2d 1351, 1352 n. 5 (Utah 1979)).

¶ 23 Here, the descriptive difference between the Warranty Deed's reference to the grantee and the actual corporate identity of the intended grantee was minimal. Though the deed was admittedly incorrect in referring to the grantee as "PCO Holdings, Inc." rather than "PCO Holding Company, Inc.," we agree with the trial court that this difference, for purposes of identification, was legally insignificant. This is not a situation in which the instrument of conveyance referred to the wrong party or incorrectly identified a non-existent person or corporation as the grantee.[5] Instead, the deed in question simply left out one word—a word which, for all of its legal import in other contexts, was relatively insignificant for the purposes of deciphering the actual identity of the intended grantee—and then added one letter to another word. Thus, in spite of these undeniably minor errors, we think that the deed did sufficiently identify the proper grantee.

¶ 24 The circumstantial evidence surrounding the situation lends further support. According to the terms of the Warranty Deed, the grantor was listed as "Wapiti Heights, LLC." The deed was then signed by McDonald and Winsor acting on the behalf of Wapiti as the grantors. Given that Mc-Donald and Winsor were conveying the properties to a corporation that they themselves owned, we think that their intentions as to this transfer were "reasonably clear." *Sunstone at Colo. Springs Homeowners Assoc.*, 56 P.3d at 129. Moreover, the clarity of their intentions is made plain by the fact that McDonald and Winsor, in their capacities as directors of PCO Holding Company, Inc., then proceeded to act as if the property had been validly conveyed to PCO Holding Company, Inc., with the property almost immediately being put to use as collateral for the Hard Money loan. Given this situation, we think that the trial court was correct in ruling that the Warranty Deed validly conveyed the parcels to PCO Holding Company, Inc.

## II. Kelly's Motion to Amend

¶ 25 Prior to the trial court's hearing on Hard Money's motion for summary judgment, Kelly filed a motion to amend his original complaint. In his motion to amend, Kelly sought leave of the court to add a claim relating to Hard Money's alleged interference with Kelly's contractual relations, as well as a claim relating to Hard Money's alleged breach of various fiduciary duties. The trial court denied Kelly's motion to amend, holding that the Utah Supreme Court's decision in *Holmes Development, LLC v. Cook*, 2002 UT 38, 48 P.3d 895, precluded a plaintiff from filing a motion to

---

5. Kelly refers us to *Julian v. Petersen*, 966 P.2d 878 (Utah Ct.App.1998), for the proposition that "an attempted conveyance of land to a nonexisting entity is void." *Id.* at 881; *accord Sharp v. Riekhof*, 747 P.2d 1044, 1046 (Utah 1987). Kelly argues that this rule applies in the present case. We disagree.

"The rule that a deed which names as grantee a nonexistent person is void applies only when the named grantee does not in fact exist.... If a living or legal person is identifiable as the grantee named in the deed, the deed is valid." 23 Am.Jur.2d *Deeds* § 29 (2002). Thus, there is a two-part inquiry involved in situations such as this one. First, the court must determine whether the grantor's intended grantee is readily identifiable. Second, the court must then determine whether that grantee is a living person or existing legal entity that is capable of holding title.

As discussed above, we think that the intended grantee in the present case was readily identifiable. Given this identification, the question then becomes whether PCO Holding Company, Inc. was an existing entity capable of holding title. There is no dispute from either party that it was. Thus, this situation is different from those found in either *Julian* or *Sharp*. In *Julian*, the court expressly noted that the conveyance involved in that case was invalid because it had purported to convey title to a deceased person. *See* 966 P.2d at 881 ("Because Mrs. Corbridge died in 1988, the attempted conveyance to her by affidavit in 1995 is invalid."). Similarly, in *Sharp*, the court held that the deed was invalid because it purported to convey title to a trust, which the court declared to be a "property interest[ ] which cannot hold property." 747 P.2d at 1046. The *Sharp* court thus emphasized that "a deed of conveyance is void unless the grantee named is capable of taking and holding the property named in the deed." *Id.* (quoting *Rixford v. Zeigler*, 150 Cal. 435, 88 P. 1092, 1093 (Cal. 1907)). Here, where PCO Holding Company, Inc., was a valid, existing entity that was capable of holding title, we hold that there was no error to find the conveyance valid.

amend in response to a defendant's motion for summary judgment. Kelly now argues that the trial court abused its discretion in denying his motion to amend his original complaint. We agree.

## A. The Contours of the Rule 15(a) Analysis

¶ 26 Rule 15(a) of the Utah Rules of Civil Procedure states that, after the responsive pleadings have been filed, "a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." In *Regional Sales Agency, Inc. v. Reichert*, we stated that "[i]n analyzing the grant or denial of a motion to amend, Utah courts have focused on three factors: the timeliness of the motion; the justification given by the movant for the delay; and the resulting prejudice to the responding party." 784 P.2d 1210, 1216 (Utah Ct.App.1989), *rev'd on other grounds by* 830 P.2d 252 (Utah 1992). Following our decision in *Regional Sales Agency, Inc.*, this three-pronged test has been repeated in later decisions as the predicate for analysis of motions to amend. *See, e.g., Jones v. Salt Lake City Corp.*, 2003 UT App 355, ¶ 16, 78 P.3d 988; *Tretheway v. Furstenau*, 2001 UT App 400, ¶ 16, 40 P.3d 649; *Atcitty v. Board of Educ.*, 967 P.2d 1261, 1264 (Utah Ct.App.1998); *Kleinert v. Kimball Elevator Co.*, 854 P.2d 1025, 1028 (Utah Ct.App.1993).

¶ 27 In their briefings before the trial court and again before us, the parties have both relied upon these three factors as the predicate for their motion to amend analyses. Given their disagreements as to the state of the law regarding these factors, and for purposes of our analysis of the trial court's decision under *Holmes Development, LLC*, it is first necessary to discuss the case law treating the scope and meaning of the three *Regional Sales Agency, Inc.* factors.

### 1. The Timeliness Prong

¶ 28 Utah appellate courts have consistently refused the invitation to establish a bright line rule regarding how far into the litigation process a motion to amend must be filed in order to be deemed untimely. In our review of the extensive body of law on motions to amend, however, two principles have emerged.

¶ 29 First, motions to amend are typically deemed untimely when they are filed in the advanced procedural stages of the litigation process, such as after the completion of discovery, on the eve of a scheduled trial date, or after an order of dismissal has already been entered. *See, e.g., Fishbaugh v. Utah Power & Light*, 969 P.2d 403, 408–09 (Utah 1998) (upholding the denial of a motion to amend where the motion was filed following two different continuances of the trial date, and only forty-four days before the third scheduled trial date); *Neztsosie v. Meyer*, 883 P.2d 920, 922 (Utah 1994) (upholding the denial of a motion to amend where the motion was filed one month after summary judgment had already been granted); *Pride Stables v. Homestead Golf Club*, 2003 UT App 411, ¶ 19, 82 P.3d 198 (upholding the denial of a motion to amend where the motion was filed "over ten years since discovery was completed"); *Jones*, 2003 UT App 355 at ¶ 17, 78 P.3d 988 (upholding the denial of a motion to amend where the motion was filed "nearly a year after the cutoff date for amending pleadings in the trial court's scheduling order"); *Tretheway*, 2001 UT App 400 at ¶ 17, 40 P.3d 649 (upholding the denial of a motion to amend where the motion was filed after entry of summary judgment for the other party); *Hill v. State Farm Mut. Auto. Ins. Co.*, 829 P.2d 142, 149 (Utah Ct.App.1992) (upholding the denial of a motion to amend where the motion was filed after "summary judgment had been granted once by the district court, an appeal heard by the Utah Supreme Court, and a second motion for summary judgment filed by State Farm with the district court"); *Regional Sales Agency, Inc.*, 784 P.2d at 1217 (upholding the denial of a motion to amend where the motion was filed on the day before trial).

¶ 30 Second, regardless of the procedural posture of the case, motions to amend have typically been deemed untimely when they were filed several years into the litigation. *See, e.g., Neztsosie*, 883 P.2d at 922 (upholding the denial of a motion to amend where the motion was filed over three years

after the filing of the original suit); *Pride Stables*, 2003 UT App 411 at ¶¶ 4–7, 82 P.3d 198 (upholding the denial of a motion to amend where the motion was filed over twelve years after the filing of the original complaint); *Kleinert*, 854 P.2d at 1025 (upholding the denial of a motion to amend where the motion was filed three years after the commencement of the suit and eight years after the original injury); *Hill*, 829 P.2d at 149 (upholding the denial of a motion to amend where the motion was filed six years after the filing of the original suit). In such cases, the ongoing passage of time makes it increasingly difficult for the non-moving party to effectively respond to the new allegations or claims. Parties in such circumstances are often hindered by witnesses who have since moved or died, by their shaky memories and recollections, or by documents which have since been lost or destroyed.

### 2. The Prejudice Prong

¶ 31 Though we stated in *Regional Sales Agency Inc.* that courts should focus on whether the nonmoving party would suffer "prejudice" if the motion to amend is granted, 784 P.2d at 1216, subsequent decisions by the Utah Supreme Court indicate that a showing of simple prejudice is not enough to support a denial of a motion to amend. In *Kasco Services Corp. v. Benson*, the Utah Supreme Court indicated that a motion to amend should be denied only where "the opposing side would be put to *unavoidable prejudice* by having an issue adjudicated *for which he had not time to prepare*." 831 P.2d 86, 92 (Utah 1992) (emphasis added) (internal quotations and citation omitted). The court's insistence that the nonmoving party suffer "unavoidable prejudice" to justify a denial of a motion to amend is well-established in Utah law, *see, e.g., Fishbaugh*, 969 P.2d at 403; *Timm v. Dewsnup*, 921 P.2d 1381, 1389 (Utah 1996), and is based on the principle that the parties should not be forced to litigate issues for which they had little time to respond. *See Timm v. Dewsnup*, 851 P.2d 1178, 1183 (Utah 1993) (noting that " '[a] prime consideration in determining whether an amendment should be permitted is the adequacy of

an opportunity for the opposing party to meet the newly raised matter' " (quoting *Lewis v. Moultree*, 627 P.2d 94, 98 (Utah 1981))); *Cheney v. Rucker*, 14 Utah 2d 205, 381 P.2d 86, 91 (Utah 1963) (noting that "[w]hat [parties] are entitled to is notice of the issues raised and an opportunity to meet them. When this is accomplished, that is all that is required."). Thus, in order to justify the denial of a motion to amend on prejudice grounds, the prejudice "must be undue or substantial prejudice, since almost every amendment of a pleading will result in some 'practical prejudice' to the opposing party. *Mere inconvenience* to the opposing party is *not* grounds to deny a motion to amend." 61A Am.Jur.2d *Pleading* § 776 (2003) (emphasis added).

> [T]he fact that an amended pleading may require the defendant to conduct additional discovery does not, alone, constitute sufficient grounds to justify the denial of a motion to amend. In determining whether the amendment will cause prejudice, the court's inquiry should center on whether the nonmoving party has a fair opportunity to litigate the new issue . . . .

*Id.* at § 777.

### 3. The Justification Prong

¶ 32 In considering the justification prong of the analysis, Utah courts have typically focused on whether the moving party had knowledge of the events that are sought to be added in the amended complaint before the original complaint was filed. *See, e.g., R & R Energies v. Mother Earth Indus. Inc.*, 936 P.2d 1068, 1080 (Utah 1997); *Atcitty v. Board of Educ.*, 967 P.2d 1261, 1264 (Utah Ct.App.1998). In cases in which our courts have found that the moving party did have prior knowledge, some courts have held that this prior knowledge indicates that the moving party did not have sufficient justification to file the amended complaint. *See, e.g., Swift Stop, Inc. v. Wight*, 845 P.2d 250, 253–54 (Utah Ct.App.1992).

¶ 33 In our view, however, such a narrow reading of the justification inquiry can prove problematic. Instead, we think that the justification prong must be predicat-

ed on something more than just whether the party had prior knowledge of the events or claims; otherwise, the justification analysis will almost inevitably lead into direct conflict with the analysis called for under the prejudice prong. The present case provides us with a clear example of this problem.

¶ 34 Here, the record indicates· that Kelly was aware that Hard Money had had some knowledge of the fiduciary relationships that existed between McDonald, Winsor, and Kelly prior to entering into the financing arrangement with PCO.[6] If prior knowledge alone was the sole focus of the justification prong, it would accordingly be clear that Kelly did not have sufficient justification for his proposed amendment and that his motion to amend could be properly denied on that basis. However, Kelly's prior knowledge of the facts supporting these allegations (and his concordant reference to those allegations in the original complaint) would cut in opposite directions when applied to the prejudice prong of the analysis. As discussed above, the inquiry under the prejudice prong would focus on whether Hard Money would suffer undue prejudice by having to litigate new issues for which it had received little notice. Given Kelly's reference to the possible violations of fiduciary duty in his original complaint, however, Hard Money's claim of prejudice would accordingly be weakened by the notice it had received from Kelly in his original complaint. *See Aurora Credit Servs. v. Liberty West Dev., Inc.,* 970 P.2d 1273, 1282 (Utah 1998) (stating that "[w]here the amendment would advance a new theory of recovery based almost entirely on facts already in evidence, the court should liberally allow amendment because the opposing party is then generally prepared to address such a claim").

¶ 35 Logic indicates that a similar analytic result would be reached in almost all cases in which the moving party has prior knowledge of the claims which are eventually sought to be added in the proposed amended complaint. In cases such as this one, this prior knowledge would have been conveyed to the defendant in the original pleadings; in most other cases, our expansive rules of discovery would likely ensure that the nonmoving party would have received fair warning of the potential issues prior to receipt of the proposed amended complaint. Thus, if the justification prong of the analysis is solely focused on the party's prior knowledge, the justification analysis will then almost inevitably be cancelled out by the resultant analysis under the prejudice prong, thereby severely weakening the internal consistency of the motion to amend analysis.

¶ 36 Given this result, we think that the justification prong of the motion to amend analysis cannot be solely limited to a discussion of whether the moving party had prior knowledge of the relevant events or potential claims. To avoid the problems discussed above, something more must be involved in the justification inquiry. Federal case law provides some illumination regarding a solution to this dilemma.

¶ 37 In *Foman v. Davis,* the United States Supreme Court reviewed a trial court's decision to deny a motion to amend. 371 U.S. 178, 179, 83 S.Ct. 227, 228, 9 L.Ed.2d 222 (1962).[7] In developing its own multi-factored test for federal appellate review, the Court did not focus on the moving party's "justification" for the proposed amendment, but instead framed the issue as being whether the motion to amend was filed as the result of "bad faith or dilatory motive on the part of the movant." *Id.* at 182, 83 S.Ct. at 230. This approach has been followed in the lower federal courts. *See, e.g., Leary v. Daeschner,* 349 F.3d 888, 905 (6th Cir.2003); *Indiana*

---

6. Indeed, Kelly actually made reference to this awareness in his original complaint, stating in his allegation of facts that "Utah law imposes fiduciary duties on members of a limited liability company" and that "Hard Money knew the limitations placed on Winsor and McDonald."

7. It is well-established that decisions and treatises examining the federal rules of civil procedure can be considered as guidance in interpreting Utah's own rules of civil procedure. *See Winegar v. Slim Olson, Inc.,* 122 Utah 487, 252 P.2d 205, 207 (1953) ("Since [the Utah Rules of Civil Procedure] were fashioned after the Federal Rules of Civil Procedure, it is proper that we examine decisions under the Federal Rules to determine the meanings thereof."); *see also Reed v. Reed,* 806 P.2d 1182, 1185 (Utah 1991); *Madsen v. Borthick,* 769 P.2d 245, 249 n. 4 (Utah 1988).

*Funeral Dirs. Ins. Trust v. Trustmark Ins. Corp.*, 347 F.3d 652, 655 (7th Cir.2003); *Hom v. Squire*, 81 F.3d 969, 973 (10th Cir.1996). More importantly, the emphasis on whether the moving party's delay was caused by "bad faith" was listed by the Utah Supreme Court in *Aurora Credit Services* as one of the factors that belongs in the analysis. 970 P.2d at 1282.

¶ 38 Thus, although the extent to which the moving party had prior knowledge of the proposed amendment should be a relevant factor in the court's analysis, the analytic thrust should actually be focused on the reasons offered by the moving party for not including the facts or allegations in the original complaint. For example, in cases where the party knew of the events or claims earlier yet failed to plead them due to a dilatory motive, a bad faith effort during the pleading process, or unreasonable neglect in terms of pleading preparation, it would follow that the motion to amend could be denied on that basis. However, where the party's prior knowledge was minimal, or where it was instead based on suspicious or inconclusive evidence, the party's decision to hold off on pleading those allegations until reliable confirmation could be obtained should not serve as grounds for procedural default.

### 4. Other Considerations

¶ 39 In addition to the three factors discussed above, we further note that Utah law does not preclude trial courts from considering other factors in their rule 15(a) determinations. Indeed, the plain language of rule 15(a) does not mention any factors at all, instead simply stating that motions to amend should be "freely given when justice so requires." Though the three factors discussed above are certainly useful in determining whether a motion to amend should be granted, our review of this and other cases indicates that repeated groupings of the factors may have given the wrong impression. Accordingly, we wish to make it clear that while courts would be well-advised to consider the timeliness, motivation, and prejudice inquiries in their determinations, courts should not regard these three factors as an exclusive list.

¶ 40 Decisions from our supreme court are instructive. Although the Utah Supreme Court's analysis in motion to amend cases has typically focused on one or more of these three factors, *see, e.g., Prince v. Bear River Mut. Ins. Co.*, 2002 UT 68, ¶ 49, 56 P.3d 524 (focusing on the timeliness of the moving party's motion to amend and on the resulting prejudice to the nonmoving party); *Kasco Servs. Corp. v. Benson*, 831 P.2d 86, 92–93 (Utah 1992) (focusing on whether the moving party's delay was predicated on bad faith, as well as on the prejudice that would result from allowing the amendment), our supreme court has also explicitly stated that the factors should be considered *alongside* any other factors that the trial court might deem relevant in a particular case. *See Aurora Credit Servs.*, 970 P.2d at 1282 (stating that "many other factors, such as delay, bad faith, or futility of the amendment, may weigh against the trial court's allowing amendment").

¶ 41 This open, multi-factored approach is consistent with the guidance offered by the United States Supreme Court in *Foman*, wherein the Court noted that

[i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc.—the leave sought should, as the rules require, be "freely given."

371 U.S. at 182, 83 S.Ct. at 230. Further, this open-factored approach is consistent with the broad grant of discretion that is afforded to trial courts when ruling on motions to amend. "The granting or denial of leave to amend a pleading is within the broad discretion of the trial court, and we will not disturb absent a showing of an abuse of that discretion." *Smith v. Grand Canyon Expeditions*, 2003 UT 57, ¶ 31, 489 Utah Adv. Rep. 3. The logic behind this discretion is sound. Trial courts are in a much better position than appellate courts to make such case-specific determinations as whether too much

time has passed to fairly allow an amendment, whether a party's delay is the result of an unfair tactic or dilatory motive, or whether some other unforseen factor militates for or against a particular result in that particular case. *See id.* at ¶ 32 (stating that "the dimensions of liberality" implicated in a rule 15(a) decision "are generally defined by the trial judge, who is best positioned to evaluate the motion to amend in the context of the scope and duration of the lawsuit"). Thus, insofar as our earlier cases have perhaps led some to conclude that rule 15(a) is governed by an exclusive three-part analysis, we now wish to stress that the motion to amend analysis is instead a multi-factored, flexible inquiry that allows trial courts the leeway to evaluate the factual circumstances and legal developments involved in each particular case.

¶ 42 Finally, although the general approach should be multi-factored, the circumstances of a particular case may be such that a court's ruling on a motion to amend can be predicated on only one or two of the particular factors. *See First City Bank, N.A. v. Air Capitol Aircraft Sales, Inc.,* 820 F.2d 1127, 1133 (10th Cir.1987) ("We hold that a district court acts within the bounds of its discretion when it denies leave to amend for 'untimeliness' or 'undue delay.' Prejudice to the opposing party need not be shown also."). Thus, depending on the facts of a particular case, the weight that a court gives to one or another particular factor may vary. *See, e.g.,* 16A Am.Jur.2d *Pleading* § 766 (2003) (noting that, in spite of potential timeliness problems, motions to amend have been allowed in cases "during or after discovery, at the pretrial conference, 'shortly prior' to trial, and during trial" where the other factors were such that an amendment was still warranted) (footnotes omitted). This sort of case-specific weighing is precisely the kind of

decision left to the trial court under rule 15(a)'s grant of discretion. However, though we have stressed here that a court is under no obligation to consider any or all of the specific factors that we have discussed above, we nevertheless reiterate the well-accepted rule that it is a per se abuse of discretion for a trial court to fail to explain its decision regarding a motion to amend with reference to the appropriate principles of law or the factual circumstances that necessitate a particular result. *See Aurora Credit Servs.,* 970 P.2d at 1281–82; *Tretheway v. Furstenau,* 2001 UT App 400, ¶ 16, 40 P.3d 649.

### B. *Holmes Development, LLC* and Kelly's Motion to Amend

¶ 43 With our discussion of the principles behind the rule 15(a) analysis in mind, we now proceed to a discussion of the trial court's ruling in the present case. Here, the trial court did not expressly rule on the validity of Kelly's motion to amend using any of the factors discussed above. Instead, the trial court ruled that Kelly's motion to amend was improper under the Utah Supreme Court's decision in *Holmes Development, LLC v. Cook,* 2002 UT 38, 48 P.3d 895.

¶ 44 In *Holmes Development, LLC,* the plaintiff (Holmes) filed suit against several parties as the result of a series of failed real estate transactions. *See generally id.* at ¶¶ 1–14. The defendants responded to Holmes's complaint by filing separate motions for summary judgment. *See id.* at ¶ 15. Holmes opposed these summary judgment motions by filing memoranda in opposition. *See id.* at ¶¶ 15, 56 n. 7. Importantly, Holmes also included language at the end of his memoranda in opposition that petitioned the court for leave to amend his complaint as an alternative means of defeating summary judgment. *See id.* at ¶ 56.[8] After receiving

---

8. As noted by the supreme court, Holmes's putative motions to amend were framed somewhat differently in the various memoranda in opposition to summary judgment. With respect to the first defendant, Holmes included language "[a]t the end of [his] memorandum" stating that "[i]n the event this Court determines that 'Holmes' Complaint fails to adequately plead the claims and causes of actions addressed above, Holmes moves this Court for leave to amend its Complaint pursuant to Rule 15 of the Utah Rules of Civil Procedure." *Holmes Dev., LLC v. Cook,* 2002 UT 38, ¶ 56, 48 P.3d 895. Following this alleged motion, Holmes then gave one case citation in support of his contention that the motion to amend should be granted as a means of defeating the motions for summary judgment. *See id.* With respect to the other defendants, Holmes's alleged motions to amend were actually contained "in a conclusory statement in the conclusion section to the memorandum" and

the various motions and memoranda from the parties, the trial court granted summary judgment to the defendants and denied Holmes's motions to amend. *See id.* at ¶¶ 16–17. Holmes appealed. *See id.* at ¶ 18.

¶ 45 In affirming the decision of the trial court to deny the motions to amend, the Utah Supreme Court stressed the procedural inadequacy of Holmes's attempts to file the requested motions to amend. The court thus noted that "[t]o properly move for leave to amend a complaint, a litigant must file a motion that 'shall be made in writing, shall state with particularity the grounds therefor, and shall set forth the relief or order sought.'" *Id.* at ¶ 57 (quoting Utah R. Civ. P. 7(b)(1)). The court further noted that the rules governing motion practice require that "a motion for leave to amend must be accompanied by a memorandum of points and authorities in support, and by a proposed amended complaint." *Id.* Applying those rules to Holmes's attempted motions to amend, the supreme court concluded that the procedural inadequacies of Holmes's attempted motions to amend were fatal. The court thus noted that,

> [i]n this case, Holmes never filed an actual motion for leave to amend. Further, Holmes's request failed to 'state with particularity the grounds' upon which it based its motion for leave to amend. Holmes merely cited rule 15(a) and noted that leave to amend should be freely given. Holmes never articulated a single reason why the trial court should have granted it leave to amend and never provided the trial court a proposed amended complaint so that the court could determine the changes that Holmes intended to make. By relegating its motion to the end of the memoranda opposing the motions to dismiss, Holmes's motions did not comply with Utah's formal motion practice rules.

*Id.* at ¶ 59 (citations omitted).

¶ 46 An entirely different scenario confronted the trial court in the present case. Here, Kelly's request for leave to amend his complaint was properly filed as a separate motion, unattached to any other legal memorandum or document. As required by the

rules, Kelly's motion to amend was accompanied by a proposed amended complaint for the trial court to review. The motion was further accompanied by a memorandum in support. In that memorandum, Kelly included citation to both rule 15 of the Utah Rules of Civil Procedure and to a Utah case discussing the rule. Further, Kelly's memorandum clearly articulated a rationale for granting the motion and then briefly discussed that rationale in light of the cited case. Given that neither the trial court nor Hard Money have at any point indicated that Kelly's motion to amend suffered from any defects of service, timing, or procedural compliance, we are left to assume that Kelly's motion was, in all relevant respects, a properly filed motion to amend.

¶ 47 According to the trial court's opinion, however, *Holmes Development, LLC* is controlling on the present litigation due to the fact that both cases involve a plaintiff filing a motion to amend his initial complaint in response to the defendant's motion for summary judgment. As discussed above, however, the *Holmes Development, LLC* court's support for the denial of the motions to amend was expressly predicated on the procedural defects in Holmes's motions to amend. *Accord Coroles v. Sabey,* 2003 UT App 339, ¶¶ 44–45, 79 P.3d 974. Contrary to the trial court's ruling here, we find no language in *Holmes Development, LLC* that would indicate that Holmes's motions to amend would still have been defective had the motions been properly filed in accordance with the rules of procedure. Thus, in the absence of any procedural defects with Kelly's motion to amend, we conclude that *Holmes Development, LLC* was inapplicable and should not have been used to deny Kelly's motion to amend. As such, the trial court's denial of Kelly's motion to amend was an abuse of discretion.

C. Proper Disposition on Remand

¶ 48 In denying Kelly's motion to amend, the trial court's misplaced reliance on *Holmes Development, LLC* prevented it from making a determination under rule 15(a) as

were devoid of reference to either rule 15 or to any cases. *Id.* at ¶ 56 n. 7.

to whether justice required that the motion to amend be granted. Both parties addressed this issue in their briefings and arguments before the trial court, however, and have again articulated their positions with respect to the rule 15(a) analysis in the briefs that have been filed with this court. Given the likelihood that this issue will be argued again below, principles of judicial economy compel us to address it here. *See Wilcox v. CSX Corp.*, 2003 UT 21, ¶ 1 n. 1, 70 P.3d 85 ("In granting [defendant's] motion for summary judgment, the trial court ... failed to 'reach the remaining issues.' One of the remaining issues, which was argued in the court below and in the briefs on appeal, is whether CSX Corporation's actions satisfy the ordinary course of business defense.... Although the trial court did not rule on this issue, we deem it appropriate to do so here."); *see also State v. James*, 819 P.2d 781, 795 (Utah 1991) ("Issues that are fully briefed on appeal and are likely to be presented on remand should be addressed by this court.").

¶ 49 Under the general principles set forth above, we conclude that the trial court should have granted Kelly's motion to amend. We first note that the litigation was still in its initial procedural stages when Kelly filed his motion to amend. The trial court had not yet established any deadlines for discovery or for the filing of amended complaints, nor had the court yet set a date for trial or entered any rulings dismissing any of the claims or parties. Kelly's motion to amend was filed on April 2, 2002, barely six months after the filing of the original complaint. This litigation had not yet concluded its first year, let alone gone through the several years of litigation that are typically present in cases of untimeliness.

¶ 50 Further, it does not appear from the record that Kelly's delay in seeking leave to add the additional claims was motivated by a dilatory or improper motive. Kelly has brought forth evidence indicating that, though he knew that Hard Money had knowledge of the fiduciary duties that existed between Kelly, McDonald, and Winsor prior to effectuating its loan to PCO Holding Company, Inc., he did not know the extent to which Hard Money had allegedly participated in what he deems to be the fraudulent plans of McDonald and Winsor until discovery was underway. Given these circumstances, we see nothing improper about Kelly seeking to act on his newfound knowledge by adding additional claims for which he now allegedly has factual backing.

¶ 51 We also conclude that Hard Money was not in a position in which it would suffer unavoidable prejudice by having to respond to the additional claims raised by Kelly in his motion to amend. Though it is true that Hard Money would likely have had to conduct additional discovery, we have noted above that the mere prospect of additional discovery being needed is generally not sufficient ground for the denial of a motion to amend. This was not a situation in which the proposed amendment was filed on the eve of trial, nor was it a situation in which the motion to amend was filed after the completion of the discovery periods. Had the motion to amend been granted, Hard Money would have had sufficient opportunity to conduct discovery, research the issues, file any motions for dismissal that may be warranted, and otherwise proceed with a defense to the additional complaints with no unavoidable prejudice attaching. Thus, we disagree with Hard Money's contention that the motion to amend should have been denied on this basis.[9]

9. Hard Money argues that our supreme court's decision in *Valley Bank & Trust Co. v. Wilken*, 668 P.2d 493 (Utah 1983), mandates a finding of prejudice in the present case. We disagree.

We first note that, as in *Holmes Development, LLC*, the supreme court's decision to uphold the denial of the motion to amend in *Valley Bank & Trust Co.* was expressly based on the procedural inadequacies of the defendants' purported motion to amend. *See* 668 P.2d at 493–94. At issue in *Valley Bank & Trust Co.* was the attempt by the defendants to raise a new affirmative defense in an affidavit that was filed the day before the hearing on the plaintiff's summary judgment motion. *See id.* On appeal, the supreme court affirmed the decision of the trial court that this purported motion to amend was not permissible under the pleading rules set forth in the Utah Rules of Civil Procedure. *See id.* Thus, *Valley Bank & Trust Co.* is distinguishable from the present case for the same reasons that we noted

¶ 52 We accordingly conclude that, given the early timing of the motion, the apparent lack of a bad faith motive, and the ability of Hard Money to respond to both the motion to amend and the additional claims, the trial court should have granted Kelly's motion to amend.

## CONCLUSION

¶ 53 The trial court's ruling granting Hard Money's motion for summary judgment with respect to the quiet title action, the declaratory judgment action, and the request for injunctive relief is affirmed. The trial court's ruling denying Kelly's motion to amend his complaint, however, is reversed. We remand the case to the trial court for further proceedings consistent with this opinion.

¶ 54 I CONCUR: JAMES Z. DAVIS, Judge.

¶ 55 I CONCUR IN THE RESULT: RUSSELL W. BENCH, Associate Presiding Judge.

above in our discussion of *Holmes Development, LLC.*

It is true that, in dicta, the *Valley Bank & Trust Co.* court concluded that the plaintiffs would have suffered prejudice had the purported motion to amend been granted. *See id.* at 494. In explaining the prejudice that would result, the court noted that the affidavit had only been filed one day before the scheduled hearing. *See id.* at 493–94. As such, if the purported motion to amend had been granted, the plaintiffs would not have had the five days to respond to the motion that are guaranteed under the Utah rules. *See* *id.* at 494. Under the court's analysis, this lack of time to respond to the motion to amend would have constituted prejudice. *See id.*

Though a similar result might have been reached in the present case, the April 5, 2002, decision of Judge Frederick to recuse himself caused a postponement of the hearing that was to be held on the motion for summary judgment and the motion to amend. The hearing was ultimately held on July 1, 2002, thus giving Hard Money sufficient time to respond to the motion to amend.